| | |
|---|---|
| THOMAS SERAFIN, <br><br>           Plaintiff, <br><br> v. <br><br> NICHOLAS S. SCHORSCH; DAVID KAY; THOMAS A. ANDRUSKEVICH; LESLIE D. MICHELSON; EDWARD G. RENDELL; WILLIAM G. STANLEY; BRIAN BLOCK; LISA MCALISTER; AND SCOTT J. BOWMAN, <br><br>           Defendants, <br><br>     -and- <br><br> AMERICAN REALTY CAPITAL PROPERTIES, INC., <br><br>           Nominal Defendant. | No. <br><br> 14 CV 9672 <br><br> SHAREHOLDER DERIVATIVE COMPLAINT <br><br><br><br> JURY TRIAL DEMAND |

Plaintiff Thomas Serafin ("Plaintiff"), by his undersigned attorneys, for his verified shareholder derivative complaint, alleges upon information and belief, except as to allegations about himself, which are based upon personal knowledge, as follows:

## SUMMARY OF ACTION

1. This is a shareholder derivative action on behalf of Nominal Defendant American Realty Capital Properties, Inc. ("American Realty" or "the Company") against certain of its officers and directors. American Realty is a publicly traded Real Estate Investment Trust ("REIT") incorporated under the laws of Maryland and is headquartered in New York City.

2. This action alleges that the Defendants breached their fiduciary duties to the Company and its shareholders for "intentional" accounting and disclosure deficiencies.

3.    In particular, the Company's Form 8-K filing on October 29, 2014, stated that, due to the discovery of accounting errors "intentionally made" and "intentionally not corrected," the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013 and Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2014 and June 30, 2014, and the Company's earnings releases and other financial communications for these periods, "should no longer be relied upon."

4.    According to the Form 8-K filing, the Audit Committee of the American Reality's Board of Directors (the "Board") conducted an investigation that revealed the Company incorrectly reported its adjusted funds from operations ("AFFO"), a non-U.S. GAAP financial measure common to REITs, for the three months ended March 31, 2014 and, as a result, overstated AFFO for this period. According to the Company, this "error" was subsequently "identified but intentionally not corrected," and other AFFO and financial statement errors were "intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014." So far, according to the Form 8-K, the Company preliminary adjustment totals to a $23 million adjustment for the six months ended June 30, 2014, but considering that the "Audit Committee has expanded its investigation to encompass the Company's audited financial statements" for the fiscal year ended December 31, 2013," further adjustments may be necessary.

5.    In the wake of the accounting improprieties revealed in the Form 8-K filing, the Company also announced that its Chief Financial Officer and Chief Accounting Officer had resigned.

6.    To rectify the underlying issues found, the Company claimed to be "re-evaluating its financial reporting controls and procedures" and stated that it "intends to make the necessary changes to its controls and procedures to remediate any control deficiencies that are identified through the Audit Committee's investigation." Nonetheless, the damage has been made to the Company and its

shareholders.

7.    Upon the filing announcement, American Realty's stock price precipitously plummeted almost 20% and, since then, has fallen further (currently down over 25% as of December 5, 2014), destroying nearly $3 billion in shareholder wealth.

8.    Due to the serious implications of these discrepancies, firms that contribute to or participate with the Company's business operations have been distancing themselves from American Realty. For example, several financial services firms have suspended sales of American Realty's REIT products, indefinitely. American Realty was also impacted with its deal to sell its Cole Capital Partners, LLC and Cole Capital Advisers, Inc. real estate investment units to retail brokerage RCS Capital Corp. ("RCS") in a $700 million deal. After the filing announcement, RCS terminated the transaction, stemming from the fear that the American Realty scandal may spill over to the Cole purchases, tainting its ability to sell shares of its non-traded REITs.

9.    Further, just days after revealing the accounting and disclosure improprieties, U.S. authorities have reportedly opened a criminal probe of American Realty. The Federal Bureau of Investigation ("FBI") is leading the investigation along with prosecutors from the U.S. Attorney Preet Bharara's office for the Southern District of New York. The U.S. Securities and Exchange Commission ("SEC") is also reportedly conducting or is about to conduct an inquiry of the accounting manipulations. Notwithstanding these investigations, several securities class action lawsuits have been filed against American Realty, asserting claims on behalf of defrauded stock purchasers.

10.    The officers and directors of American Realty owed fiduciary duties of care and loyalty to the Company, including a duty to ensure that it maintained effective internal controls over the Company's financial reporting processes and its disclosures to shareholders. The material accounting and disclosure failures admitted by the Company were directly within the purview of the Company's

officers and directors.

11.     As detailed herein, American Realty caught the eye of the public through its rapid growth rate. Since its inception, the Company completed over 20 acquisitions, mainly contributing to the exponential growth in total assets by 78x in just 2 years, from $256 million at December 31, 2012 to over $20 billion as of October 2014. This rapid growth has brought concerns over having adequate internal controls to sustain such growth. Indeed, these lack of controls and procedures not only led to the "intentional" accounting discrepancies announced in the October 29, 2014 filing, but also to at least two prior account and disclosure errors that also occurred in 2014.

12.     Because of the deliberate indifference and sheer failure to ensure that adequate controls and procedures were in place during this time, and by causing the Company to issue false financial statements, each member of the Board acted in bad faith and faces a substantial likelihood of liability for breach of fiduciary duty. Under these circumstances, Plaintiff did not make a pre-suit demand on the Board to pursue the claims alleged herein for breach of fiduciary duty because such a demand would have been futile and is therefore excused. Demand is also excused because the directors' lack of independence due to their substantial compensation from American Reality.

13.     This action seeks to recoup losses that American Realty has sustained, and will continue sustaining, in connection with the restatement and related proceedings.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because complete diversity exists between plaintiff and each Defendant and the amount in controversy exceeds $75,000 exclusive of interest and costs. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

15.     This Court has jurisdiction over each Defendant because each Defendant is either a

corporation that conducts business in and maintains operations in this District, a citizen of New York, or is an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because American Realty maintains its principal place of business in this District, one or more of the Defendants resides in or maintains executive offices in this District, a substantial portion of the transactions complained of herein occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

17. Plaintiff Thomas Serafin is a citizen of New Jersey and is a holder of 134 shares of American Realty stock.

### Nominal Defendant

18. Nominal Defendant American Realty is a publicly traded REIT organized under Maryland law, headquartered in 405 Park Ave., 12th Floor, New York, New York. According to its public statements, American Realty acquires, owns and operates single-tenant and multi-tenant commercial real estate properties. According to its public statements, American Realty's property portfolio is leased to high quality corporate tenants which typically occupy properties located in "well-trafficked, strategic locations." American Realty purports to focus on acquiring mid-term and long-term leases which provide for monthly income generation and "outsized growth potential over the longer term." American Realty is traded on NASDAQ Global Select Market under the symbol "ARCP." American Realty is a citizen of Maryland and New York.

**Individual Defendants**

## A. **Director Defendants**

19.    Defendant Nicholas S. Schorsch ("Schorsch") is the founder of American Realty and Chairman of the Board. In October 2014, Schorsch stepped down as Chief Executive Officer of American Realty, succeeded by defendant David Kay ("Kay"). Schorsch's 2014 salary is $1.1 million. In 2014 the Compensation Committee awarded Schorsch an equity retention award valued at $24.8 million. Furthermore, despite over one-third of the Company's shareholders' advisory (non-binding) vote to reject its executive "outperformance" plan, the Board's adoption to the plan could net Schorsch $94.4 million in compensation over the next five years, depending on American Realty's performance. According to InvestmentNews and the Wall Street Journal, in a May 19 report, governance watchdogs Institutional Shareholders Services Inc. have criticized the overall executive compensation package, including Schorsch's large compensation. Schorsch signed the admittedly false and misleading SEC filings for the first and second quarters of fiscal year 2014, as well as the Form 10-K for fiscal year 2013 that American Realty has disclosed should no longer be relied upon. Schorsch is a citizen of New York.

20.    Defendant Kay has been a director since February 2014, and recently succeeded Schorsch as Chief Executive Officer. He has been the President of American Realty since December 2013. Kay's 2014 salary is $600,000. In 2014, the Compensation Committee awarded Kay a $4.6 million cash retention award, a $15,000 signing bonus, and a $3.2 million equity retention award. Kay signed the Form 10-K for fiscal year 2013 that American Realty has disclosed such information which should no longer be relied upon. Kay is a citizen of New York.

21.    Defendant Thomas A. Andruskevich ("Andruskevich") has been a director since February 2014. Andruskevich signed the Form 10-K for fiscal year 2013 that American Realty has

disclosed such information which should no longer be relied upon. Andruskevich is a citizen of New York.

22.      Defendant Leslie D. Michelson ("Michelson") has been a director since October 2012 and is currently a member of the Board's Audit Committee, Compensation Committee, and Nominating and Governance Committee. For fiscal year 2013, Michelson was paid $273,280 in cash and stock compensation. Michelson signed the Form 10-K for fiscal year 2013 that American Realty has disclosed such information which should no longer be relied upon. Michelson is a citizen of New York.

23.      Defendant Edward G. Rendell ("Rendell") has been a director since February 2013 and is currently a member of the Board's Audit Committee, Compensation Committee, and Nominating and Governance Committee. For fiscal year 2013, Rendell was paid $202,272 in cash and stock compensation. Rendell signed the Form 10-K for fiscal year 2013 that American Realty has disclosed such information which should no longer be relied upon. Rendell is a citizen of Pennsylvania.

24.      William G. Stanley ("Stanley") has been a director since January 2014 and is currently a member of the Board's Audit Committee, Compensation Committee, and Nominating and Governance Committee. Stanley signed the Form 10-K for fiscal year 2013 that American Realty has disclosed such information which should no longer be relied upon. Stanley is a citizen of New York.

25.      Defendants Schorsch, Kay, Andruskevich, Michelson, Rendell, Stanley are collectively referred to herein as the Director Defendants. The Director Defendants comprise a majority (6 out of 7) of the current Board.

**B.   Former Director Defendant**

26.      Defendant Scott J. Bowman ("Bowman") was a director of the Company from February 2013 through September 2014.  Bowman signed the Form 10-K for fiscal year 2013 that

American Realty has disclosed such information which should no longer be relied upon. Bowman was a member of the Audit Committee during the subject periods. Bowman is a citizen of New York.

## C. Former Officer Defendants

27.    Defendant Brian Block ("Block") was the Company's Chief Financial Officer, Treasurer, Secretary and Executive Vice President. Block resigned from the Company in October 2014 in connection with the accounting restatement. Block signed the admittedly false and misleading first and second quarter fiscal year 2014 Forms 10-Q, and the Form 10-K for fiscal year 2013 that American Realty has disclosed such information which should no longer be relied upon. Block is a citizen of New York.

28.    Defendant Lisa McAlister ("McAlister") was the Company's Chief Accounting Officer and Senior Vice President. McAlister resigned from the Company in October 2014 in connection with the accounting restatement. McAlister signed the admittedly false and misleading second quarter fiscal year 2014 Form 10-Q, and the Form 10-K for fiscal year 2013 that American Realty has disclosed such information which should no longer be relied upon. McAlister is a citizen of New York.

29.    Defendants Block and McAlister are referred to herein as the Former Officer Defendants. The Director Defendants, defendant Bowman, and the Former Officer Defendants are collectively referred to as the Individual Defendants.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

30.    By reason of their positions as officers, directors, and fiduciaries of American Realty and because of their ability to control its business and corporate affairs, each of the Individual Defendants owed American Realty and its shareholders fiduciary duties of care and loyalty in the management and administration of American Realty's affairs, as well as in the use and preservation of

American Realty's property and assets. As such, they were required to act in furtherance of the best interests of American Realty and its shareholders and prohibited from engaging in self-dealing and unlawful corporate conduct, such as violations of the laws applicable to American Realty and its business.

31.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate complete, accurate, and truthful information regarding American Realty's business, operations, management, and corporate conduct so that the market price of American Realty stock would be based on truthful and accurate information.

32.     Fiduciary duty especially applies to the Director Defendants who serve or served on the Audit Committee - Michelson, Rendell, Bowman, and Stanley – because they have a special relationship with the Company. Under the Audit Committee Charter, they are required to oversee the accounting and financial reporting process of the Company and the audits of the financial statements of the Company, and monitor the integrity of the Company's financial statements, the performance of the Company's internal audit function, the Company's compliance with legal and regulatory requirements, and the Company's overall risk profile. In addition, according to the Audit Committee Charter, these directors "shall review and discuss the quarterly financial statements with management and the Independent Auditor."  Furthermore, the Audit Committee directors shall discuss with management and the auditor the Company's earnings press releases (with particular focus on any "pro forma" or "adjusted" and other non- GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies.

33.     The Company also maintains to follow certain ethical standards.  According to public statements, the Company expresses its Corporate Responsibility by stating the following:

**What We Stand For**

As is the case for all investment programs within the ARCP family of companies, the manner in which we create value for our stockholders defines who we at ARCP are, who we can be and who we will be.

Our company culture, which we consider to be the root of our success, is established on ethical values and a commitment to approaching every decision through the eyes of the investors we serve. We do this in the confidence that the more accountable we are to stockholders today, the better our business will be in the future.

This foundation guides all of our actions, policies and programs, including our corporate governance (led by an independent board of directors), fully transparent reporting, due diligence and regulatory compliance, and industry-leading best practice standards which are designed to protect the investor's best interest at all times. These duties are important to us because we know that how we do things is just as important as what we do.

This is how we demonstrate to our stockholders daily that ARCP is a partner they can trust.

34.     The Company's ethical standards are particularly outlined in its Code of Ethics, which

states in relevant part as follows:

**Public Company Reporting**

As a public company, it is of critical importance that the Company's filings with the Securities and Exchange Commission (the "SEC") be accurate, timely and in accordance with all applicable laws and regulations. Depending on their position with the Company, an employee, officer or director may be called upon to provide necessary information to assure that the Company's public reports are complete, fair and understandable. The Company expects employees, officers and directors to take this responsibility very seriously and to provide prompt accurate answers to inquiries related to the Company's public disclosure requirements.

**Financial Statements and Other Records**

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must both conform to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, please consult the board of directors.

**Duty To Report**

Each director, officer and employee who is involved in the Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC regulations. Each director, officer and employee who is involved in the Company's public disclosure process must: (a) be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and (b) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

35.     The Individual Defendants led shareholders to believe they can be trusted. However, the Individual Defendants have shown otherwise due to the "intentional" accounting and disclosure discrepancies.

36.     More importantly, the Individual Defendants, because of their positions of control and authority as directors and/or officers of American Realty, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. The misconduct of the Individual Defendants involves a culpable violation of their obligations, the absence of good faith on their part, and a reckless disregard for the fiduciary duties owed to American Realty and its shareholders, which they were aware or should have been aware posed a risk of serious injury to American Realty.

37.     At all relevant times, each Individual Defendant was the agent of each other and of American Realty, and was acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

### A. Company Background

38.     American Realty is a self-managed real estate company that acquires, owns and operates single-tenant, free-standing commercial real estate properties primarily subject to net leases

with high credit quality tenants. The Company invests in properties that are net leased to (a) credit tenants, which are generally large public companies with investment-grade ratings and other creditworthy tenants and (b) governmental, quasi-governmental and not-for-profit entities.

39. The Company's long-term business strategy is to acquire a diverse lease portfolio consisting of approximately 70% long-term leases and 30% medium-term leases, with an average remaining lease term of 10 to 12 years. This investment strategy is designed to provide for stable income from credit tenants and growth opportunities from re-leasing of below market leases.

40. As of June 30, 2014, the Company owned 3,966 properties comprising 106.8 million square feet of single and multi-tenant retail and commercial space located in 49 states, which include properties owned through consolidated joint ventures. As of June 30, 2014, the rentable space at these properties was 98.8% leased with a weighted average remaining lease term of 9.95 years. As of June 30, 2014, the Company also owned 25 commercial mortgage-backed securities, 14 loans held for investment, and had interests in six properties comprising 1.6 million rentable square feet.

41. The Company's primary business objective is to generate dependable monthly cash dividends from a consistent and predictable level of funds from operations ("FFO") and adjusted funds from operations ("AFFO") per share and capital appreciation associated with extending expiring leases or repositioning its properties for lease to new credit tenants upon expiration. According to the Company, FFO and AFFO are prime indicators of the performance of a REIT. These calculations exclude such factors as depreciation and amortization of real estate assets and gains or losses from sales of operating real estate assets, and facilitate comparisons of operating performance between periods and between other REITs in the Company's peer group.

42. According to the Company, accounting for real estate assets in accordance with Generally Accepted Accounting Principles ("GAAP") implicitly assumes that the value of real estate

assets diminishes predictably over time. According to the Company, many industry investors and analysts have considered the presentation of operating results for real estate companies that use historical cost accounting to be insufficient by themselves.

43. As alleged herein, American Realty is controlled by defendant Schorsch, who as Chairman is responsible for "strategic company oversight." Schorsch controls a web of related real estate and investment companies. For example, in 2007, Schorsch co-founded AR Capital, a full service, alternative investment advisory firm. He currently serves as AR Capital's Chairman and Chief Executive Officer and also holds executive and board positions for all of the publicly registered, non-traded investments sponsored by AR Capital. Additionally, Schorsch served as Chairman of American Realty Capital Trust, a publicly traded net lease REIT he co-founded in 2007.

**B. False Statements**

44. On February 27, 2014, the Company announced its operating results for the fourth quarter and full fiscal year 2013, ended December 31, 2013. The press release stated in part:

Company Highlights

For the quarter ended December 31, 2013 (as compared to the same quarterly period in 2012):

- o Increased revenues 213% to $94.1 million as compared to $30.1 million.
- o Improved AFFO available to common stockholders by 153% to $55.8 million.
- o Increased AFFO per diluted share by 108% to $0.25.
- o Generated proceeds of $690.0 million in convertible note offerings at an average cost of 3.4%.
- o Grew the monthly dividend in December to $0.94 per share coincident with the closing of CapLease, Inc. ("CapLease") and increased again to $1.00 per share upon the closing Cole.
- o Expanded credit facility borrowing capacity to $2.4 billion and further extending to $2.97 billion in the first quarter of 2014.

For the year ended December 31, 2013 (as compared to 2012):

13

- Increased revenues over 260% to $240.5 million as compared to $66.8 million.
- Improved AFFO available to common stockholders by 240% to $163.9 million.
- Increased AFFO per diluted share by over 80% to $0.86.
- Invested $3.4 billion in 676 acquired real estate properties.
- Closed on (i) $2.3 billion acquisition of American Realty Capital Trust III, Inc. ("ARCT III"), (ii) $2.2 billion acquisition of CapLease and (iii) the $774.0 million acquisition of the GE/Trustreet portfolio, successfully integrating all acquisitions into the Company's property portfolio.
- Hired key executives, David S. Kay, President, Lisa Beeson, Chief Operating Officer and Lisa Pavelka McAlister, Chief Accounting Officer, as well as CapLease key executives including Paul H. McDowell, in a successful transition to self-management. In addition, as recently announced, completed senior management hiring with the addition of Richard A. Silfen as General Counsel.

\* \* \*

## Management Commentary

Nicholas S. Schorsch, Chairman and CEO, explained "As these results unequivocally demonstrate, we have accomplished an extraordinary amount in a very short time, underscoring our ability to execute key initiatives on every level across the organization. We will complete over $1.0 billion of acquisitions during the first quarter, at a pace ahead of projections and accretive to our earnings. Our robust pipeline of property acquisitions, as well as other corporate opportunities we are privy to, is consistent with our ability to grow impressively, while staying true to our strategy. Complementing our balance sheet operations, our Private Capital Management business will raise at least $950.0 million on behalf of our managed funds in the first quarter, also at a pace exceeding our projections, fueling earnings growth from the high-margin management fee revenue our team is producing. In addition to the strong growth we have seen with our earnings, ARCP's improved leverage posture and identified G&A synergies from the Cole acquisition are also generating a positive impact to the bottom line. Not only did we beat consensus estimates for the fourth quarter, our first quarter is off to a tremendous start. When you compare these financial results to our peer group valuation metrics, particularly dividend yield and earnings multiple, we believe our Company is undervalued and poised for a share price increase."

David S. Kay, President, said, "Our acquisition progress in 2014 is a direct result of ARCP having one synergized, cohesive group that is executing our strategy of self-originated acquisitions at attractive yields, delivering on our promises. Because of our tremendous real estate team – both in size and expertise – no one else in the marketplace can execute at the same level in terms of deal sourcing,

thoughtful underwriting and efficient closing of property acquisitions. More than $1.0 billion of acquisitions, at an average cap rate of 8.3%, are expected to be completed in the first quarter and are a testimony to the efficiency and effectiveness of our acquisition machine. As a result of our disciplined approach, our current buying pace will clearly exceed our original acquisition target of $2.0 billion for the year. The earnings growth our high-yielding acquisitions will deliver is enhanced by the fee revenue we are generating within the Private Capital Management business. We expect to acquire several billion of additional assets this year on behalf of our managed funds. This should result in a material increase in total fee-generating assets under management. We are determined to be one of the most recognized and admired REITs, regardless of sector, while leading the evolution of net lease real estate."

\*\*\*

Brian S. Block, Chief Financial Officer, remarked, "2013 proved to be a record-setting year for ARCP both in terms of earnings and growth, allowing us to beat consensus estimates. Based on the strength of our self-originated acquisitions, success in our Private Capital Management business and savings in G&A costs from having true economic scale, we firmly believe that 2014 will be an even more impressive year. These factors should fortify our 2014 AFFO guidance of $1.13 to $1.19 per share. In the last 100 days, we have further strengthened our balance sheet through deleveraging and de-risking by reducing our secured debt exposure, lowering our interest rate profile and extending our maturities. The strength of our balance sheet complements the strength of our real estate portfolio and our high percentage of investment grade tenants in particular. Having high-quality tenants with low probabilities of default creates particularly strong and durable income – income that better supports leverage when compared to lesser quality net lease portfolios. We believe these factors informed Moody's and S&P to provide investment grade ratings, and further prompted the fixed income investors who participated in our record $2.55 billion unsecured bond deal. With strong AFFO per share growth, an attractive property portfolio, strong credit tenants bounded by long-term net leases and an attractively positioned balance sheet, we believe ARCP has the catalysts to provide long-term shareholder returns."

45.     According to the press release, FFO for the fourth quarter 2013 totaled $(93.2) million, or $(0.43) per share, including one-time merger and other transaction related expenses of $111.7 million. FFO for the full fiscal year 2013 totaled $(249.5) million, or $(1.43) per share, including one-time merger and other transaction related expenses of $280.0 million. Excluding such one-time costs, FFO was $30.4 million, or $0.16 per share fully diluted. AFFO for the fourth quarter 2013 totaled $55.8 million, or $0.25 per fully diluted share. AFFO for the full fiscal year 2013 totaled $163.9

million, or $0.86 per share fully diluted. On February 27, 2014, the Company filed a Form 10-K with the SEC repeating these reported results. This Form 10-K was signed by defendants Schorsch, Block, McAlister, Kay, Michelson, Stanley, Rendell and Andruskevich.

46.    Furthermore, the Form 10-K stated that in accordance with Rules 13a-15(b) and 15d-15(b) of the Securities Exchange Act of 1934, management, with the participation of the Chief Executive Officer (Schorsch) and Chief Financial Officer (Block), evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by the Form 10-K:

**Disclosure Controls and Procedures**

In accordance with Rules 13a-15(b) and 15d-15(b) of the Exchange Act, management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded, as of the end of such period, that our disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by us in our reports that we file or submit under the Exchange Act.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles.

47.    The October 29, 2014 Form 8-K filing stated the contrary, making these certifications false. According to the Company, the financial results reported in the fourth quarter and full year 2013 press release and the corresponding Form-10-K "should no longer be relied upon" in light of "key roles" played by defendants Block and McAlister in their preparation.

48. On May 8, 2014, the Company announced its operating results for the first quarter of fiscal year 2014, ended March 31, 2014. The press release stated in part:

Selected operating highlights for the quarter include:

> **Increased Revenue**: Increased revenue to a record $320.6 million, up 647.4% compared to the same period a year earlier.
> **Increased AFFO**: Increased AFFO available to common stockholders to $147.4 million, up 334.6% compared to the same period a year earlier.
> **Balance Sheet Acquisitions**: Completed $1.03 billion of acquisitions on the balance sheet, comprised of 224 properties in 78 individual transactions at an average cap rate of 8.24% (8.02% cash cap rate), with another over $700 million already closed or under contract for the second quarter.
> **Cole Capital Acquisitions**: Acquired $419.9 million of real estate assets on behalf of the managed funds in the first quarter, comprising 84 properties in 51 individual transactions.
> **Cole Capital**: On track to raise $3.1 billion in 2014: Raised $897 million of capital on behalf of the managed funds in the first quarter.
> **Investment Grade Balance Sheet**: Secured investment grade rating from S&P and received a reaffirmation of investment grade from Moody's.
> **Multi-Tenant Spin-off**: Announced spin-off of American Realty Capital Centers, Inc. (NASDAQ: ARCM) ("ARCM") which is expected to be completed by mid-June.

"I am very pleased with our results for the first quarter of the year," said Nicholas S. Schorsch, Chief Executive Officer and Executive Chairman of ARCP. "We had a record quarter with earnings coming exactly in line with our expectations of $0.26 AFFO per share, consistent with our previously stated guidance for the year. Additionally, our year-to-date acquisitions, combined with properties currently under contract puts us well-ahead of schedule to achieve our total 2014 annual acquisition targets by midyear. With our strengthened balance sheet, and the Company ready to capitalize on a number of large-scale sale- leaseback transactions, we are in position to deliver strong shareholder return this year. The management team is working cohesively and my plan for succession as Chairman is advancing as anticipated."

"With our acquisitions team firing on all cylinders, every aspect of our business is exceeding our expectations," said David S. Kay, President of ARCP. "With strong earnings, our acquisition volume is outpacing our guidance, our cap rates surpass all industry peers, Cole Capital launched two new products, and we successfully integrated our management and systems, all of which is allowing us to execute with a disciplined intensity. The $1.7 billion of acquisitions we have closed or placed under contract were at a 7.92% cash cap rate or 8.26% GAAP cap rate. These 150 self-originated transactions are

indicative of the scale and expertise of our platform, providing a significant competitive advantage. Finally, we are ramping up our capital raising initiatives in May and remain confident that we will achieve our target of raising $3.1 billion of capital during 2014."

49.    According to the press release, FFO for the first quarter totaled $(183.8) million, including one-time merger and other transaction related expenses of $222.2 million. Excluding such one-time costs, FFO was $38.4 million, or $0.07 per fully diluted share. AFFO for the first quarter totaled $147.4 million, or $0.26 per fully diluted share. On May 8, 2014, the Company filed a Form 10-Q with the SEC repeating these reported results. This Form 10-Q was signed by defendants Schorsch and Block. Defendants Schorsch and Block further certified that the financial statements were accurate and that the Company's internal controls were sufficient:

> In accordance with Rules 13a-15(b) and 15d-15(b) of the Securities Exchange Act, as amended (the "Exchange Act"), we, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

50.    These certifications were also false. As revealed in the October 29, 2014 8-K filing, the "intentional" accounting misstated the financial results reported in the first quarter 2014 press release and the corresponding SEC filing. The 8-K filing also revealed that the Company lacked adequate internal controls during this time period, contrary to the evaluations certified.

51.    On July 29, 2014, the Company announced its operating results for the second quarter of fiscal year 2014, ended June 30, 2014. The press release stated in part:

> Selected operating highlights for the quarter include:

> **Increased Revenues:** Increased revenues to $382.0 million, up 595.2% compared to the same period a year earlier.
> **Increased AFFO:** Increased AFFO to $205.3 million, up 429.0% compared to the same period a year earlier, and increased AFFO per share to $0.24, up 26% compared to the same period a year earlier.

**Pro Forma AFFO Run Rate:** Pro forma normalized estimated AFFO run rate as of year-end 2014 of $1.18 - $1.20 per share including 2014 completed and announced transactions. This AFFO estimate does not include any balance sheet acquisitions in excess of our $4.5 billion 2014 guidance, no dispositions, no rent growth or G&A synergies for 2015 and assumes results for Cole Capital consistent with the Company's 2014 projection.

**Acquisitions:** Completed $834.7 million of net lease acquisitions on the balance sheet and an additional $751.1 million of real estate assets on behalf of the Cole Capital managed funds.

**Dispositions:** Sold eight properties for total net proceeds of $40.8 million, for a year--to--date total of 25 properties sold for $96.4 million.

**Cole Capital Equity Raise:** Raised $161.0 million of capital on behalf of the managed REITs in the second quarter and $1.1 billion year-to-date as of June 30, 2014.

**De-levered and Refinanced Debt:** Refinanced $282.2 million in Q2 with an average maturity of 1.9 years and a weighted average interest rate of 3.5%; $1.0 billion refinanced year-to-date as of June 30, 2014 with an average maturity of 2.0 years and a weighted average interest rate of 4.7%. Pro forma net debt annualized adjusted EBITDA as of June 30, 2014 is 6.3x.

**Improved Corporate Governance:** Terminated our investment relationship with RCS Capital; took steps to eliminate independent directors' presence on the boards of any non-traded real estate investment trusts sponsored by AR Capital, LLC ("ARC"); enhanced intellectual diversity and leadership by expanding our Board in 2014 with four new members including William Stanley, Thomas Andruskevich, Bruce Frank and David Kay (Mr. Kay's appointment effective October 1) and establishing plans to add an additional independent director by year-end. In addition, our directors will opt-out of the Maryland Unsolicited Takeover Act ("MUTA") allowing our stockholders the right to elect our entire Board of Directors at each annual meeting. Further governance and compensation changes are described below.

\* \* \*

### President's Comments on Operating Results

"Our second quarter results and accomplishments are indicative of our focus on driving long-term value by delivering on our commitments as outlined in our June 20[th] stockholder letter," said David S. Kay, President of ARCP. "In six months, we have fully integrated the organization, achieved $38.0 million of the $77.0 million of cost synergies to come in the first year, reduced leverage, de-risked the balance sheet, lengthened debt maturities, created $11.8 billion of unencumbered assets and significantly extended and upsized our credit facility. With these actions undertaken and the formative stage of the company behind us,

we are focused on the day-to-day operations of the company. Through all of these undertakings, we are positioned for long-term success."

"Our balance sheet acquisitions in the quarter, owned and under contract, of 1,217 properties in over 210 separate transactions demonstrates the continuing systematic execution of our core acquisition strategy and testifies to the repeatability of our investment process. As always, we see a tremendous volume of deals, but with only approximately $250 million of acquisitions remaining to transact in calendar year 2014 on the balance sheet to meet our previously announced $4.5 billion target, we intend to maintain a highly disciplined and selective approach to purchase the best assets for the portfolio. Our real estate team remains able to self-originate and close transactions in a timely manner – both at a granular level and for large-scale sale-leasebacks. This enables us to achieve superior pricing. Moreover, by routinely culling through the existing portfolio, we are identifying further opportunities that can be realized by harvesting capital derived from non-core assets and re-deploying that capital in an accretive manner. At the same time, we are thoughtfully managing our debt portfolio by lengthening debt maturities and taking advantage of the current rate environment. The daily execution of these collective actions allows us to maintain our 2014 AFFO per share guidance of $1.13 - $1.19, while significantly de-levering the balance sheet and maximizing value for our stockholders."

52.     According to the press release, FFO for the second quarter totaled $174.7 million, or $0.20 per share fully diluted. AFFO for the second quarter totaled $205.3 million, or $0.24 per fully diluted share. On July 29, 2014, the Company filed a Form 10-Q with the SEC repeating these reported results. This Form 10-Q was signed by defendants Schorsch, Block and McAlister. Defendants Schorsch and Block further certified that the financial statements were accurate and that the Company's internal controls were sufficient:

In accordance with Rules 13a-15(b) and 15d-15(b) of the Securities Exchange Act, as amended (the "Exchange Act"), we, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

53.     As revealed on October 29, 2014, the financial results reported in the second quarter 2014 press release and the corresponding SEC filing were false. Furthermore, the disclosures about

the adequacy of the Company's internal controls were also false.

## C. **"Intentional" Discrepancy Uncovered**

54.     Since the start of the year, the Company was bursting with positive news:  completing its acquisition of Cole Real Estate Investments, closing on a $1.5 billion sale-leaseback with Red Lobster, selling a multi-tenant shopping center to Blackstone.  The Company tripled in size since the beginning of the year (from $7.8 billion to about over $20 billion as of October 2014).  Yet, the momentum stopped on October 29, 2014, when the Company blindsided shareholders it discovered accounting "errors" in its financial statements and "changes in accounting personnel." According to the Company's Form 8-K filing:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> On October 24, 2014, the Audit Committee of the Board of Directors (the "Audit Committee") of American Realty Capital Properties, Inc. (the "Company") concluded that the previously issued audited consolidated financial statements and other financial information contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013, the previously issued unaudited financial statements and other financial information contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2014 and June 30, 2014, and the Company's earnings releases and other financial communications for these periods (collectively, the "Prior Financial Information") should no longer be relied upon.
>
> The Audit Committee based its conclusion on the preliminary findings of its investigation into concerns regarding accounting practices and other matters that first were reported to the Audit Committee on September 7, 2014. The Audit Committee promptly initiated an investigation, which is being conducted with the assistance of independent counsel and forensic experts.
>
> The investigation conducted to date has not uncovered any errors in the consolidated financial statements (prepared in accordance with U.S. GAAP) for the three months ended March 31, 2014. However, based on the preliminary findings of the investigation, the Audit Committee believes that the Company incorrectly included certain amounts related to its non-controlling interests in the calculation of adjusted funds from operations ("AFFO"), a non-U.S. GAAP financial measure, for the three months ended March 31, 2014 and, as a result, overstated AFFO for this period. *The Audit Committee believes that this error was*

*identified but intentionally not corrected, and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014.*

As discussed in Item 5.02 of this Current Report on Form 8-K, at the request of the Audit Committee, *the Company's Chief Financial Officer and Chief Accounting Officer have resigned.*

Nothing has come to the attention of the Audit Committee that leads it to believe that there are any errors in the Company's previously issued audited consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013. However, *the Audit Committee has expanded its investigation to encompass the Company's audited consolidated financial statements for the fiscal year ended December 31, 2013 in light of the fact that the Company's former Chief Financial Officer and former Chief Accounting Officer had key roles in the preparation of those financial statements.*

Based on the preliminary findings of the investigation, the Company has identified the potential adjustments set forth in Exhibit 99.1 to this Report to the Company's reported net loss in accordance with U.S. GAAP for the three and six months ended June 30, 2014 and to reported AFFO (a non-U.S. GAAP financial measure described in Exhibit 99.1) for the three months ended March 31, 2014 and the three and six months ended June 30, 2014. Note that, in calculating AFFO for the first quarter of 2014, the Company presented activity from non-controlling interests on a net basis, while in the second quarter of 2014, as permitted, the Company presented its activity from non-controlling interests on a gross basis (which it will continue to do in calculating AFFO in future periods). The weighted average number of shares used in calculating AFFO differs depending on whether the net or gross method is used (but does not change for purposes of calculating net loss per share in accordance with U.S. GAAP). *The investigation is ongoing and there can be no assurance that the potential adjustments set forth in the table below will not change based upon the final results of the investigation, and any such change could be material.*

The Company will work with the Audit Committee and the Audit Committee's independent advisors to determine the adjustments required to be made to the Prior Financial Information as expeditiously as possible. Upon the completion of this process, which could identify further adjustments in addition to those discussed above, the Company will restate the Prior Financial Information and amend its prior periodic filings to the extent required. The Company will file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2014 after the amended filings have been made.

In light of the preliminary findings of the Audit Committee's investigation, the Company is reevaluating its internal control over financial reporting and its

disclosure controls and procedures. The Company intends to make the necessary changes to its control environment to remediate all control deficiencies that are identified as a result of the ongoing investigation and the restatement process.

(Emphasis added).

55.    The Company issued a press release in conjunction with the Form-8K filing; stating, in relevant part:

> "The accounting issues are unacceptable and we are taking the personnel and other actions necessary to ensure that this does not happen again. As disappointed as I am, I do not believe that this impairs, in any meaningful way, what is important about our Company – the high quality and diversification of our real estate assets, the depth and strength of our management team, the strong and predictable cash flows from our leases, the strength of our balance sheet and the size of our market opportunity," said David S. Kay, Chief Executive Officer of ARCP.
>
> Although the Board is disappointed in these developments, the Board has full confidence in the management team and staff. The Audit Committee, Board and management team are fully committed to resolving this matter in an expedited and thorough manner. The Board continues to support management's efforts surrounding the simplification of the business, enhancements in transparency, and improvements to the predictability of our earnings, all with the goal of enhancing long-term value.

56.    According to the Form 8-K filing, AFFO for the first quarter 2014 was restated downwards from $147,780,000 to $135,806,000, AFFO for the second quarter was restated downwards from $205,278,000 to $194,409,000, and AFFO for the first six months of 2014 was restated downwards from $353,058,000 to $330,215,000, a total of $23 million. On a per share basis, AFFO for the first six months of fiscal year 2014 was restated downwards from $.49 to $.45.

57.    The market reacted quickly and negatively to this announcement. Upon disclosing the accounting discrepancies, American Realty's share price precipitously dropped as much as 35% in intraday trading before closing down 20%, going from $12.38 (October 28, 2014 closing price) per share to approximately $10.00 per share. In an instant, billions of shareholder wealth vanished. In a conference call to discuss the results, defendant Kay revealed that although the first-quarter results

23

were overstated as the result of an "error," the second-quarter results were based on a calculation made "in order to conceal the error from the first quarter." Defendant Kay sought to attribute the manipulations to "bad judgment."

58.    According to the Bloomberg article entitled "American Realty Accounting Errors Roil Real Estate Empire" dated November 5, 2015:

> The accounting scandal at American Realty Capital Properties Inc. (ARCP) is threatening to upend a real estate empire built by Nicholas Schorsch in an industry where reputation propels growth.
>
> The disclosure last week that accounting errors were intentionally concealed at the real estate investment trust, leading to the resignation of two executives, has erased almost $4 billion in market value, sparked an FBI investigation and a review by the Securities and Exchange Commission. It also is leading some brokers to halt sales tied to Schorsch's AR Capital LLC, the biggest sponsor of nontraded REITs.
>
> The accounting mistakes are weighing on other parts of the web of companies created by Schorsch, the 53-year-old chairman of New York-based American Realty Capital Properties and its chief executive officer until last month. The REIT now faces the challenge of regaining investors' trust, as does AR Capital, which uses brokers to sell shares to individual investors who only need Google to find the recent travails.
>
> "*It's the intentional nature of the error*" *that raises concern*, said Kevin Gannon, president and managing director at Robert A. Stanger & Co., a Shrewsbury, New Jersey-based investment bank that compiles data on nontraded REITs. "*This industry is all about credibility. People will raise money for you but they have to be confident that you're a straight shooter.* We hope they demonstrate that this is an isolated incident."
>
> \*\*\*
>
> RCS Capital
>
> Another Schorsch company, RCS Capital Corp. (RCAP), is an investment firm with businesses including raising money for AR Capital and other nontraded REITs. That company -- whose shares have plunged more than 40 percent since the news of the accounting issues on Oct. 29 -- this week pulled out of a deal to buy American Realty Capital Properties's Cole Capital private-capital management unit.
>
> RCS, where Schorsch is chairman, today took steps to distance itself from American Realty Capital Properties, emphasizing that it's a separate company from American

Realty Capital with a distinct board and management. RCS learned of the accounting matters with the rest of the market on Oct. 29, the company said in a statement.

\*\*\*

Deal Spree

The REIT has completed more than 20 acquisitions since its inception, according to data compiled by Bloomberg. The company's stock price rose to as high as $17.82 in May 2013.

*"There were many people in the space who raised concerns about very rapid growth,"* said Barry Vinocur, the editor of REIT Wrap, an industry newsletter. *"When you grow that rapidly the risk is things may fall through the cracks. Then, there were those who downplayed those concerns saying those raising them were envious."*

Broker Sales

The concerns are spilling into AR Capital. LPL Financial Holdings Inc. said yesterday it is indefinitely suspending sales of investment products sponsored by companies tied to American Realty and RCS. Securities America, a broker-dealer with more than 1,800 advisers, also has suspended sales for two REITs --- Cole Capital Properties V and Phillips Edison - ARC Grocery Center REIT II, the company said in a statement. Sandlapper Securities LLC, an independent broker-dealer based in Greenville, South Carolina also suspended orders for AR Capital REITs, CEO Trevor Gordon said in a phone interview.

*"This accounting error is very troubling to us,"* Gordon said. *"Is this an isolated incident or a systemic problem? We're stepping back at this moment in time. We're not terminating our agreement but we're suspending new purchases for the time being."*

\*\*\*

"Any time your firm gets a public black eye, especially a high-profile black eye, that makes clients nervous," Edde said. *"It makes brokers nervous because they don't want to lose clients. No broker in any firm wants to see their nose bloodied in the press."*

Due Diligence

"Most of the independent broker-dealers that sell nontraded REITs have some due-diligence effort in order to vet the sponsors of the nontraded REITs," Adornato said in a telephone interview from New York. *"It would be difficult if not impossible for any broker to sell shares in any Cole product until the investigation into ARCP/Cole's financial controls is satisfactorily completed."*

***

59.    In particular with the very rapid growth, the concerns raised were valid. According to an article entitled "SEC to Open Inquiry into American Realty Capital's Accounting" dated October 29, 2014:

* * *

Standard & Poor's on Wednesday placed American Realty Capital's triple-B-minus credit rating, which is one notch above so-called junk status, on watch for possible downgrade.

The accounting incident sent shock waves through the real-estate industry, where Mr. Schorsch has raised tens of billions of dollars in recent years, much of it from individual investors.

***

*American Realty Capital has run into accounting issues before. In June, shortly after the company announced it had agreed to pay $1.5 billion for 500 Red Lobster locations, hedge-fund firm Marcato Capital Management LP sent a letter to American Realty Capital's board in which it criticized two errors related to the deal.*

*In one instance, American Realty Capital reported an inaccurate share count to investors in its first quarter 2014 financial statements, according to Marcato, one of the REIT's largest shareholders. The company later corrected the share count in a filing.*

American Realty Capital also stated that fees associated with the Red Lobster deal were $108 million, but in a later filing said that the fees were actually $10.8 million.

*"We believe the existence of these errors is symptomatic of the larger problem: The Company is engaging in too many transformative transactions too quickly," Marcato wrote at the time.*

Analysts suggested it was too soon to assess the damage to the company or Mr. Schorsch's broader empire. *Some investors "may throw in the towel on today's news, as accounting missteps take a while to sort out," Paul Adornato, a REIT analyst with BMO Capital Markets, said in a client note. "Confidence takes longer to return, if ever."*

26

Others said the errors could directly undermine American Realty Capital's growth strategy, which has relied on tapping the debt and equity markets for capital to pay for acquisitions.

*The company's "credibility is likely impugned for some period of time," wrote J.P. Morgan analyst Anthony Paolone, adding that "capital costs will be higher in the near term...thus making growth more difficult."*

(Emphasis supplied).

60.     According to both the Bloomberg and Wall Street Journal articles, promptly after the Company disclosed these accounting improprieties, the FBI initiated an investigation as the SEC issued an inquiry.

61.     Shrouding with these issues, several firms have indefinitely suspended sales of American Realty's REIT investment products since the October 29, 2014 revelations, including: AIG Advisors Group and National Planning Holdings; in addition to LPL Financials, Securities America, and Sandlapper Securities, LLC that are mentioned in the Bloomberg article.

62.     On November 3, 2014, it was announced that RCS' board of directors had decided to terminate its proposed $700 million deal to purchase certain business divisions from American Realty "in light of the disclosures made by ARCP." According to RCS, "by doing so, [RCS] has moved swiftly and decisively to protect its franchise, the interests of its shareholders and the ongoing prospects and continuing enterprise value of the company and its subsidiaries." The Company did follow suit against RCS, but settled the matter for $60 million – a far cry of the expected proposed sale amount.

63.     On November 18, 2014, the Company announced that it had received a notice from NASDAQ stating that it was not in compliance with NASDAQ listing requirements since the Company plans to delay its filing of its third quarter financial results, ended September 30, 2014, until January 2015.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

64.     Plaintiff brings this action derivatively on behalf of American Realty to redress injuries suffered, and to be suffered, by American Realty as a direct result of violations of the breaches of fiduciary duty alleged herein. American Realty is named as a Nominal Defendant solely in a derivative capacity.

65.     Plaintiff will adequately and fairly represent the interests of American Realty in enforcing and prosecuting its rights and has hired experienced counsel. Plaintiff was a shareholder of American Realty at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current American Realty shareholder.

66.     American Realty is controlled by its Board, which at the time this action was commenced, consisted of seven members, six of whom are named herein: detail Defendants by name.

## 1.     Defendants Intentionally Violated Their Fiduciary Duties

67.     At the time of the material accounting and disclosure failures for the three months ended March 31, 2014, the Individual Defendants held an officer and/or directorial position with American Realty. Demand is excused as to each of the Director Defendants for reasons described below.

### A.  Schorsch:

68.     Demand on Schorsch is excused because he lacks independence. The Company's 2014 Proxy Statement concedes that Schorsch does not satisfy NASDAQ's director independence standards. Indeed, Schorsch founded American Realty and derives his principal income from American Realty and a web of related entities he controls, including material salary and retention awards, as alleged herein. In addition, demand on Schorsch is excused because he actively participated in approving, reviewing and disseminating American Realty's false financial statements and false SEC

filings. For example, Schorsch signed the fiscal year 2013 Form 10-K that American Realty filed with the SEC, which "should no longer be relied upon" and which contained false statements concerning the supposed adequacy of the Company's internal control environment - which was in truth materially degraded at the time of said Form 10-K. Schorsch also signed the Forms 10-Q for the first and second quarters of 2014 which contained admittedly false financial information, and false statements regarding the adequacy of the Company's internal controls. These matters are now the subject of an SEC investigation and a criminal probe being conducted by the FBI and federal prosecutors.

69.    Accordingly, Schorsch is conflicted as he is personally interested in the outcome of any inquiry or litigation concerning American Realty's false statements. In addition, Schorsch faces a substantial likelihood of liability based on his participation in the approval, review and dissemination of American Realty's false financial results, statements and SEC filings concerning the purported adequacy of the Company's internal controls.

70.    Demand on Defendant Schorsh is therefore excused.

**B. Kay:**

71.    Demand on Kay is excused because he lacks independence. As an executive of the Company, Kay does not satisfy NASDAQ's director independence standards. Indeed, Kay derives his principal income from American Realty, including material salary and cash and equity retention awards, as alleged herein. In addition, demand on Kay is excused because he actively participated in approving, reviewing and disseminating American Realty's false financial statements and false SEC filings. For example, Kay signed the fiscal year 2013 Form 10-K that American Realty filed with the SEC, which "should no longer be relied upon" and which contained false statements concerning the supposed adequacy of the Company's internal control environment - which was in truth materially degraded at the time of said Form 10-K. Kay also endorsed the Company's first and second quarter

2014 financial results in quarterly earnings press releases, as alleged herein. These matters are the subject of an SEC investigation and a criminal probe being conducted by the FBI and federal prosecutors.

72.     Accordingly, Kay is conflicted in that he is interested in the outcome of any inquiry or litigation concerning American Realty's false statements.   In addition, Kay faces a substantial likelihood of liability based on his participation in the approval, review and dissemination of American Realty's false financial results and statements concerning the Company's internal controls.

73.     Demand on Defendant Kay is therefore excused.

**C.  Andruskevich:**

74.     Demand on Andruskevich is excused because he breached his fiduciary duties by causing or allowing the improper financial information to be included in the Company's SEC reports and press releases for fiscal years 2013 and 2014. As a director, Andruskevich had a duty to maintain the Company's internal control environment, particularly in light of the Company's rapid growth, and its history of prior financial reporting errors, as alleged herein. Yet Andruskevich utterly failed to so do. As a result, any demand upon him would be futile. In addition, these matters are now the subject of an SEC investigation and a criminal probe being conducted by the FBI and federal prosecutors.

75.     Accordingly, Andruskevich is interested in the outcome of any inquiry or litigation concerning American Realty's false statements.   In addition, he faces a substantial likelihood of liability based on his participation in the approval, review and dissemination of American Realty's false financial results and statements concerning the Company's internal controls. Furthermore, Andruskevich lacks independence from Schorsch, who founded American Realty and dominates its business and affairs. In addition, Andruskevich would never act to jeopardize the substantial director service fees he receives, which are material to him.

76. Demand on Defendant Andruskevich is therefore excused.

**D. Michelson:**

77. Michelson was a member of the Audit Committee during the period that false statements were disseminated to American Realty's shareholders. As alleged herein, the Audit Committee is responsible for reviewing the integrity of the Company's accounting and reporting processes and financial information provided to the shareholders and filed with the SEC. Michelson breached his fiduciary duties by causing or allowing the improper financial information to be included in the Company's SEC reports and press releases for fiscal years 2013 and 2014. Michelson had a special duty to ensure that appropriate measures were taken to fix and maintain the Company's internal control environment, particularly in light of the Company's rapid growth, and its history of prior financial reporting errors, as alleged herein. Yet Michelson utterly failed to so do. As a result, any demand upon him would be futile. In addition, these matters are now the subject of an SEC investigation and a criminal probe being conducted by the FBI and federal prosecutors.

78. Accordingly, Michelson is conflicted in that he is interested in the outcome of any inquiry or litigation concerning American Realty's false statements. In addition, he faces a substantial likelihood of liability based on his participation in the approval, review and dissemination of American Realty's false financial results and statements concerning the Company's internal controls. Furthermore, Michelson lacks independence from Schorsch, who founded American Realty and dominates its business and affairs. In addition, Michelson would never act to jeopardize the substantial director service fees he receives, which are material to him.

79. Demand on Defendant Michelson is therefore excused.

**E. Rendell:**

80. Rendell was also a member of the Audit Committee during the period that false

statements were disseminated to American Realty's shareholders. As alleged herein, the Audit Committee is responsible for reviewing the integrity of the Company's accounting and reporting processes and financial information provided to the shareholders and filed with the SEC. Rendell breached his fiduciary duties by causing or allowing the improper financial information to be included in the Company's SEC reports and press releases for fiscal years 2013 and 2014. Rendell had a special duty to ensure that appropriate measures were taken to fix and maintain the Company's internal control environment, particularly in light of the Company's rapid growth, and its history of prior financial reporting errors, as alleged herein. Yet Rendell utterly failed to so do. As a result, any demand upon him would be futile. In addition, these matters are the subject of an SEC investigation and a criminal probe being conducted by the FBI and federal prosecutors.

81.     Accordingly, Rendell is conflicted in that he is interested in the outcome of any inquiry or litigation concerning American Realty's false statements. In addition, he faces a substantial likelihood of liability based on his participation in the approval, review and dissemination of American Realty's false financial results and statements concerning the Company's internal controls. Furthermore, Rendell lacks independence from Schorsch, who founded American Realty and dominates its business and affairs. In addition, Rendell would never act to jeopardize the substantial director service fees he receives, which are material to him. Finally, Rendell publicly exclaimed that, notwithstanding the serious implications of <u>intentional fraud</u> committed at the Company, investors raising concerns about the scandal were making a "mountain out of a mole hill," demonstrating that he is incapable of impartially considering a demand.

82.     Demand on Defendant Rendell is therefore excused.

**F.  Stanley:**

83.     Stanley was a member of the Audit Committee during the period that false statements

were disseminated to American Realty's shareholders. As alleged herein, the Audit Committee is responsible for reviewing the integrity of the Company's accounting and reporting processes and financial information provided to the shareholders and filed with the SEC. Stanley breached his fiduciary duties by causing or allowing the improper financial information to be included in the Company's SEC reports and press releases for fiscal years 2013 and 2014. Stanley had a special duty to ensure that appropriate measures were taken to fix and maintain the Company's internal control environment, particularly in light of the Company's rapid growth, and its history of prior financial reporting errors, as alleged herein. Yet Stanley utterly failed to so do. As a result, any demand upon him would be futile. In addition, these matters are now the subject of an SEC investigation and a criminal probe being conducted by the FBI and federal prosecutors.

84. Accordingly, Stanley is conflicted in that he is interested in the outcome of any inquiry or litigation concerning American Realty's false statements. In addition, he faces a substantial likelihood of liability based on his participation in the approval, review and dissemination of American Realty's false financial results and statements concerning the Company's internal controls. Furthermore, Stanley lacks independence from Schorsch, who founded American Realty and dominates its business and affairs.

85. Demand on Defendant Stanley is therefore excused.

86. Demand is excused because the Director Defendants, comprising a majority of the current Board, failed to detect, prevent and halt the pervasive accounting problems that were occurring at American Realty in the face of serious problems that existed throughout the Company with respect to its internal control environment. Permitting the Company to continue to operate in this compromised fashion while its growth exploded was not the product of a valid exercise of business judgment. The Company's SEC filings falsely represented that the Company maintained an effective

internal control environment, and that the Company's financial statements were accurate and free of misstatement. The internal control environment was the Director Defendants' responsibility. This conduct was so egregious on its face that board approval cannot possibly meet the test of business judgment, and a substantial likelihood of director liability therefore exists.

## COUNT I

## BREACH OF FIDUCIARY DUTY

## (Against the Individual Defendants)

87.     Plaintiff incorporates by reference the allegations set forth above.

88.     Each of the Individual Defendants was a director and/or officer of American Realty during relevant times, and as such owed to the Company fiduciary obligations.  In violation of these fiduciary duties of good faith, candor, and loyalty, the Individual Defendants failed to disclose, or caused the Company to fail to disclose, material information and/or made material misstatements to shareholders regarding the Company's business, financial condition, and revenue recognition. These Individual Defendants knew or recklessly disregarded that the statements about American Realty's business, its financial condition, and revenue were false and misleading when made.

89.     The preparation and dissemination of inaccurate press releases and SEC filings alleged herein represents a failure by the Individual Defendants to assure the existence within American Realty of appropriate and adequate internal financial controls and a reasonable information and reporting system necessary to assure the accuracy of the Company's financial reporting.

90.     Further, when put on notice of internal control problems, the Individual Defendants had a fiduciary duty to promptly take appropriate action to correct the misconduct and prevent its recurrence.

91.     Defendants willfully ignored obvious and pervasive problems with American Realty's

internal controls alleged herein, and by deliberate and knowing indifference failed to make a good faith effort to correct the problems until it was far too late.

92.     Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to shareholders materially inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures.  These actions could not have been a good faith exercise of prudent business judgment.

93.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision. By virtue of their conduct alleged herein, the Individual Defendants engaged in intentional misconduct and knowing violations of their duties.

94.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, American Realty has sustained significant damages, not only monetarily as alleged herein, but also to its corporate reputation and goodwill.

95.     As a result of the misconduct alleged herein, the Individual Defendants are liable to American Realty.

## COUNT II

## CONTRIBUTION AND INDEMNIFICATION

### (Against the Individual Defendants)

96.     Plaintiff incorporates by reference the allegations set forth above.

97.     American Realty is alleged to be liable to private persons, entities, and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to the Individual Defendants' liability to American Realty.

98.     American Realty's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal,

and/or bad faith acts or omissions of the Individual Defendants.

99.     American Realty is entitled to contribution and indemnification from each of the Individual Defendants in connection with all such claims that have been, are, or may in the future be asserted against American Realty by virtue of the Individual Defendants' wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of American Realty, demands judgment as follows:

A.     Determining that this suit is a proper derivative action and certifying plaintiff as an appropriate representative of American Realty for said action;

B.     Declaring that the Individual Defendants have violated their fiduciary duties to American Realty and its shareholders;

C.     Awarding American Realty the damages sustained by American Realty as a result of the Individual Defendants' breaches of fiduciary duties, in an amount to be determined at trial, together with pre-judgment and post-judgment interest;

D.     Equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including (a) the institution of appropriate corporate governance reforms and internal control improvements to remediate and prevent the recurrence of the accounting and other misconduct alleged herein, and (b) attaching, impounding, imposing a constructive trust on, or otherwise restricting the Individual Defendants' assets so as to assure that plaintiff has an effective remedy;

E.     Awarding plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: December 8, 2014


**NEWMAN FERRARA LLP**

By:_____

Jeffrey M. Norton
1250 Broadway, 27th Floor
New York, NY 10001
Tel. (212) 619-5400
Fax (212) 619-3090
jnorton@nfllp.com

## Verification

I, THOMAS SERAFIN, hereby verify and declare under the penalty of perjury that I have reviewed the foregoing shareholder derivative complaint, entitled, *Thomas Serafin v. Nicholas S. Schorsch, et al.* (the "Complaint"), know the contents thereof, and, authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on the investigation of counsel. I have personal knowledge of the facts stated in paragraph 13 of the Complaint, which are true and correct.

Dated December 6, 2014

THOMAS SERAFIN